CLEVELAND UMBAUGH *v.* STATE OF ARKANSAS

5563                                   463 S. W. 2d 634

Opinion delivered March 1, 1971

*Daily, West, Core & Coffman,* for appellant.

*Ray H. Thornton, Jr.,* Attorney General; *Mike Wilson,* Asst. Atty. Gen., for appellee.

J. FRED JONES, Justice. By information filed by the prosecuting attorney in the Sebastian County Circuit Court, Cleveland Donald Umbaugh was charged with the crime of kidnapping, in that he did unlawfully, feloniously and forcibly take Joselyn Howard and carry her, against her will, from one place to another place in this state for the purpose of committing a felony. Umbaugh was found guilty at his trial before a Sebastian County jury and was sentenced by the trial judge to 30 years in the Arkansas Penitentiary. Umbaugh has appealed to this court and relies on the following point for reversal:

> "The testimony of Mrs. Birtie Smith involved solely a prior bad act allegedly committed by Appellant. This testimony was wholly irrelevant to the charge for which Appellant was on trial, was highly inflammable and its admission resulted in prejudicial error."

The evidence is in conflict as to the felony intended, but there is little question that one was committed. On the afternoon of March 25, 1970, the prosecuting witness, Joselyn Howard, a 17 year old Negro high school girl (small for her age), was walking along the sidewalk on her way home from school. The appellant, a 22 year old married white man, and his 19 year old white companion, Darrell Wayne Hurley, were sitting in a parked automobile owned by the appellant as Miss Howard passed by. They stopped Miss Howard, took her into the automobile and drove to a secluded area known as "Wildcat Mountain" near the Arkansas River and there they both, according to their own testimony, had sexual relations with her.

Miss Howard, or Joselyn, as she will hereafter be called, testified that as she passed the alley where the automobile was stopped, Hurley got into the back seat

as Umbaugh seized and gagged her; forced her into the front seat of the two-door automobile and locked the door. She testified that he then drove to near the Arkansas River where he forced her to disrobe and where he raped her in the front seat of the automobile. She testified that she lost consciousness during the assault by Umbaugh and does not know whether Hurley also assaulted her or not; but that when she regained consciousness, Umbaugh had placed a "rag" around her face and was pulling her from the automobile. She says that Umbaugh then forced her down the hill toward the Arkansas River and said that he was going to throw her into the river. She testified when Umbaugh ordered her to wade into the water, she kicked her shoes off and started running. She says that she ran through some water and fell down and that while she was on her knees in the water, Umbaugh picked up a rock and threw it down near her and directed her on toward the river. She says that she again got away from Umbaugh and Hurley and that they both ran after her and tried to catch her. She says that while they were chasing her they were also throwing rocks at her, but that she finally eluded them and called the officers from the home of Margaret Cook, who lived in the first house she came to.

Hurley testified for the state. He testified that he and Umbaugh had been drinking beer and that Umbaugh asked Joselyn if she wanted a ride; that when she declined and stated that she only lived a short distance from where they were, Umbaugh got out of the car and ordered Joselyn into the automobile. He testified that Joselyn got into the automobile; that Umbaugh locked the car door and drove to "Wildcat Mountain." The rest of Hurley's testimony corroborated that of Joselyn. He testified that he also had sexual relations with Joselyn after Umbaugh did. He testified that Umbaugh then blindfolded Joselyn and led her away from the car and told her he was going to kill her. He testified that Umbaugh then told Joselyn that he was going to throw her into the river and drown her, but that she got away by outrunning Umbaugh.

Umbaugh's statement given to the police was read

in evidence. He admitted that he picked Joselyn up in his automobile; that he and Hurley then took her to "Wildcat Mountain" where they both had sexual relations with her. He stated that she willingly entered the automobile and went with them upon Hurley's invitation, and that she affirmatively consented to sexual relations.

Birtie Smith testified, over the appellant's objections, that her brother married Umbaugh's sister and that while visiting her brother in December of 1968, Umbaugh offered to drive her and her three year old child to their home at Arkoma, Oklahoma, in Umbaugh's automobile. She testified that instead of driving her home, Umbaugh drove to "Wildcat Mountain" near the Arkansas River and there he forced her to have sexual relations with him by threatening to kill the child. She testified that Umbaugh actually did choke the child until she finally submitted to him.

Umbaugh testified in his own defense. The substance of his testimony was that Joselyn, as well as Mrs. Smith, willingly accompanied him to "Wildcat Mountain" and willingly engaged in sexual relations with him. He admits blindfolding Joselyn and telling her that since they had no further use for her, he was going to throw her into the Arkansas River and drown her. He admits throwing rocks at her and trying to overtake her when she finally escaped. But, he testified that this was all in fun just to torment, tease and scare Joselyn, and that he intended no harm to her at all. He did admit, however, that he was no longer amused by his conduct.

The appellant has cited 15 cases in support of his contention that the trial court committed reversible error in admitting the testimony of Mrs. Smith. We have examined all the cases cited by the appellant and they all turn on the nature and facts of the case being tried, and the purpose for which the evidence of prior acts were offered. We will not attempt here to analyze and distinguish all the cases cited because the various categories attending the most of them were thoroughly dis-

cussed in the two latest ones; *Moore, et al* v. *State,* 227 Ark. 544, 299 S. W. 2d 838; *Alford* v. *State,* 223 Ark. 330, 266 S. W. 2d 804.

In *Alford,* as well as in *Moore,* the extraneous evidence was offered to show intent in connection with the crime charged, but intent was not an actual element in either case. In *Alford* the charge was rape, the conviction was for rape, and the penalty was death. There was no question as to identity of the defendant, there was no question as to his intent, and there was no question that his intent was carried out under the persuasive blade of a hunting knife. The defendant did not testify. The facts in *Alford* bring that case squarely within the rule stated in one paragraph of that opinion, as follows:

> "No one doubts the fundamental rule of exclusion, which forbids the prosecution from proving the commission of one crime by proof of the commission of another. The State is not permitted to adduce evidence of other offenses for the purpose of persuading, the jury that the accused is a criminal and is therefore likely to be guilty of the charge under investigation. In short, proof of other crimes is never admitted when its only relevancy is to show that the prisoner is a man of bad character, addicted to crime."

In another paragraph in *Alford* we also said:

> "The rule is designed to protect the innocent, but it is often invoked as a basis for excluding *any* evidence that tends to show the commission of another offense. We have repeatedly rejected unfounded appeals to the protection of the basic rule of exclusion. If other conduct on the part of the accused is independently relevant to the main issue—relevant in the sense of tending to prove some material point rather than merely to prove that the defendant is a criminal—then evidence of that conduct may be admissible, with a proper cautionary instruction by the court. 'While the principle is usually spoken of

as being an exception to the general rule, yet, as a matter of fact, it is not an exception; for it is not proof of other crimes as crimes, but merely evidence of other acts which are from their nature competent as showing knowledge, intent or design, although they may be crimes, which is admitted. In other words, the fact that evidence shows that the defendant was guilty of another crime does not prevent it being admissible when otherwise it would be competent on the issue under trial.' *State* v. *DuLaney,* 87 Ark. 17, 112 S. W. 158."

In analyzing the various categories where proof of other crimes is offered in evidence, such as to show motive, to rebut the plea of an alibi, etc.; as to the issue of intent in *Alford,* we said:

"The issue of intent is *theoretically* present in every criminal case, and for that reason it is here that we are most apt to overlook the basic requirement of independent relevancy. \* \* \* What has happened is that the emphasis has shifted from evidence *relevant* to prove intent to evidence *offered for the purpose* of proving intent, by showing that the defendant is a bad man. If this transfer of emphasis is permitted the exclusionary rule has lost its meaning.

\*    \*    \*

Quite evidently this category includes the many charges of assault with intent to commit a specified crime, for here the State must prove not merely the assault but also that it was made with a certain intent. Hence, since the accused's purpose is at issue, proof of other similar offenses is independently relevant. *Stone* v. *State,* 162 Ark. 154, 258 S. W. 116; *Hearn* v. *State,* 206 Ark. 206, 174 S. W. 2d 452; *Gerlach* v. *State,* 217 Ark. 102, 229 S. W. 2d 37, Wigmore on Evidence (3rd Ed.), § 357.

\*    \*    \*

Thus our cases very plainly support the common-sense conclusion that proof of other offenses is com-

petent when it actually sheds light on the defendant's intent; otherwise it must be excluded. * * *''

In the *Moore* case, supra, the four defendants were convicted of murder in the perpetration of a robbery. They confessed the crime and led the officers to the scene of the crime and to the decomposed body of their victim. The trial court accepted into evidence testimony that two of the defendants had beaten and robbed another man, under similar circumstances, five days after the murder for which they were being tried. In reversing the conviction for error in admitting the evidence, this court again reviewed the decisions on the point but added nothing to the opinion in *Alford.* Intent was not an element involved in either case.

In 2 Wigmore on Evidence, 3rd Ed., § 302 the reasoning and basis for the admission of prior criminal acts as evidencing intent is set out in the following language:

> ". . . similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defence or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, *i. e.* criminal, intent accompanying such an act; and the force of each additional instance will vary in each kind of offense according to the probability that the act could be repeated, within a limited time and under given circumstances, with an innocent intent. The general canon of logical inference already examined (*ante,* §§ 31, 32) is here applied and illustrated.

> Such is the theory of evidencing Intent, as expounded, in various phrasings and for all sorts of offenses, in repeated judicial utterances.

> \* \* \*

It will be seen that the peculiar feature of this

process of proof is that the *act itself is assumed to be done,*—either because (as usually) it is conceded, or because the jury are instructed not to consider the evidence from this point of view until they find the act to have been done and are proceeding to determine the intent. This explains what is a marked feature in the rulings of the Courts, namely, a disinclination to insist on any feature of common purpose or general scheme as a necessary requirement for the other acts evidentially used. It is not here necessary to look for a general scheme or to discover a united system in all the acts; the attempt is merely to discover the intent accompanying the act in question; and the prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent. The argument is based purely on the doctrine of chances, and it is the mere repetition of instances, and not their scheme, that satisfies our logical demand.

Yet, in order to satisfy this demand, it is at least necessary that prior acts should be *similar.* Since it is the improbability of a like result being repeated by mere chance that carries probative weight, the essence of this probative effect is the likeness of the instance.

\* \* \*

It is just this requirement of similarity which leaves so much room for difference of opinion and accounts for the bewildering variances of rulings in the different jurisdictions and even in the same jurisdiction and in cases of the same offense. Some judges incline to treat the judicial test of probative value as identical with the common-sense test, and to admit such instances as bear a similarity liberally interpreted by the standard of every-day reasoning. Other judges set their faces firmly against every instance which is not on all fours with the offense in issue, regardless of the consideration that justice consists quite as much in protecting the public

against evil doers as in showing mercy to those whose guilt has been more or less skillfully concealed. It is hopeless to attempt to reconcile the precedents under the various heads; for too much depends on the tendency of the Court in dealing with a flexible principle. One Court will be certain to exclude everything that is not too clearly probative for even technical quibblers to oppose and sometimes will exclude even that. Another Court will accept whatever has real probative value. Something, however, may perhaps be gained by realizing, as to the former, that it is not the law, nor precedent, nor principle, nor policy, that will account for such rulings, but merely a rooted inclination to take the stricter view and a preference to err in favor of defendants and against innocent victims."

In the case at bar, intent to commit a crime (rape) is a primary element of the kidnapping charge under which the appellant was tried and for which he was convicted. The prosecuting witness and the appellant's accomplice testified that the appellant forcibly and without her consent transported her to a secluded area on "Wildcat Mountain" and there put her in fear of her life and ravished her. The appellant testified that the prosecuting witness voluntarily accompanied him to "Wildcat Mountain" and voluntarily submitted to him.

Now, under these circumstances, if the state had proven by the testimony of ten other women that the appellant had also in recent months taken them to this "Wildcat Mountain" against their will and there ravished them, there would be little question but that such testimony would be admissible; not to prove the crime of rape, or as for that matter, to prove that the prosecuting witness was taken to "Wildcat Mountain" by force or against her will, but for the purpose of showing the appellant's motive and intent in taking her to the secluded area on "Wildcat Mountain."

*Hearn* v. *State*, 206, Ark. 206, 174 S. W. 2d 452, was a case in which intent *was* an element in the crime involved.

The defendant in that case was convicted of assault with *intent* to rape. The prosecuting witness definitely identified the defendant and testified that sometime after 10 o'clock at night she was proceeding alone to her home and "he walked up behind me. I heard somebody starting to speak, I looked up and kept thinking I recognized him and didn't. He said, 'How far are you going?' I said, 'I live right here.' That was Mr. Tanner's house. Then he reached up with his hands and put them around my throat, attempted to choke me, and I screamed. Then he said something as he turned me loose and ran and I don't know what it was." The questionable evidence in the *Hearn* case was the testimony of another woman who testified that about two months previously the appellant had torn a screen from a window and had come to her bedroom where she was sleeping; grabbed her and started to twist her leg and that when she screamed, the defendant ran. Another witness testified that about two months before the act involved in the case being tried, he had seen the defendant one night peeping in the window of the home of the witness's brother and that he had taken the defendant and turned him over to the officers. This court affirmed the conviction in *Hearn* and approved the admission of the evidence as to the prior acts. To the same effect is *Gerlach* v. *State*, 217 Ark. 102, 299 S. W. 2d 37, where the appellant was convicted of an assault with intent to rape one Mabel Reeder, who was a 12 year old child.

The appellant in the case at bar admitted, both in his pretrial statement and in his testimony, that he was 22 years of age, married and had a little girl of his own. He admitted that he picked up the prosecuting witness whom he had never seen before, and took her in his automobile out to "Wildcat Mountain" and that she was agreeable to, and acquiesced in, everything that happened to her. He does not say what his intent was in picking her up in the first place or in taking her to "Wildcat Mountain." He does state that his intent in threatening to kill and drown her and in throwing rocks at her was simply to torment, tease and scare her, and he explains his intent in attempting to take her into the Arkansas River was to wash mud from her clothing, as

well as his own. He explains his intent in running after her when she finally eluded him, was to get her to return to the automobile so that he could take her home.

Even without the testimony of Mrs. Smith, there was ample evidence to sustain the conviction. The testimony of Mrs. Smith was an anticlimax to what the jury had already heard even before the appellant testified. Yet, the jury only found the appellant guilty as charged and left it to the trial court to fix the punishment when the jury could have sent him to the penitentiary for 99 years. So it would appear from the verdict that the minds of the jurors were not greatly inflamed by the testimony of Mrs. Smith.

It is not a question at this point whether the state *should* have offered the testimony of Mrs. Smith or whether the trial court *should* have admitted it. The question is whether the acceptance of the evidence constituted reversible error.

According to Mrs. Smith she is even related by marriage to the appellant and when she accepted his offer to take her to her home in Oklahoma, he took her instead *via* a "short cut" to "Wildcat Mountain" and there he treated her as he did Joselyn, except he didn't throw rocks at her and threaten to drown her after he had accomplished his purpose.

We are of the opinion that the testimony was admissible, under all the facts of this case, for the limited purpose it was offered; and that the trial court did not commit reversible error in admitting it under the proper instructions given by the court as to its use and purpose.

The judgment is affirmed.